UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MILTON GONZALEZ,

                    Petitioner,

          v.

HAROLD GRAHAM, Superintendent,
Auburn Correctional Facility,

                    Respondent.

---

13 Civ. 8112


**OPINION**


Petitioner Milton Gonzalez applies for a writ of habeas corpus pursuant

to 28 U.S.C. § 2254.  He is acting *pro se*.  He alleges that the State of New York

is holding him in violation of his federal constitutional rights, and he seeks

either a reversal of his conviction or a sentence reduction.

### Facts

On November 17, 2008, petitioner was indicted on two counts.  The first

count charged Robbery in the Second Degree, New York Penal Law § 160.10[1],

and the second count charged Criminal Impersonation in the First Degree,

Penal Law § 190.26.  The indictment alleged that petitioner impersonated a

police officer as part of a robbery on November 4, 2008.

Petitioner's jury trial in New York Supreme Court in New York County

began on May 27, 2009.  The state showed that petitioner, with accomplices,

lured a victim into the inner lobby of an apartment building, then displayed a false police badge and directed the victim to place his hands against a wall, whereupon petitioner and an accomplice stole a mobile phone and cash from the victim's pockets.  Later on the day of the robbery, police officers viewed surveillance videos from the building's security system and identified petitioner as a suspect.  Petitioner was arrested the next day.  When arrested, petitioner had a false police badge in his pocket.

On the first day of trial, before jury selection, the prosecutor informed the court that, although there were four cameras in the apartment building's lobby areas and entryway, detectives on the case only copied and retrieved as evidence videos from two of the four cameras.  The videos from the other two cameras had been "overwritten," and material relevant to the present case was thus lost.  The lost videos apparently showed the inner lobby, where the actual robbery occurred, whereas the saved footage primarily depicted the victim and defendants entering and leaving through the entryway.  The prosecutor further stated that the building superintendent and the officers who responded to the crime scene viewed incriminating footage on all four cameras on the night of November 4, 2008.  The prosecutor applied for those witnesses to testify as to what they had seen on the lost surveillance videos.  Subsequently, the prosecutor withdrew that application, and ultimately, the jury heard no testimony as to the content of the lost videos.

During her opening statement at the trial, the prosecutor stated the following:

> Now you will not see the actual robbery on the video because the defendant, who lived in the building for years, made sure the robbery occurred at the only blind spot for the security cameras in the lobby of the building, but on this video you will see the people that [the victim] describes to you.  Trial Tr. p. 15 (Dkt. No. 11).

The prosecutor thus argued to the jury that the videos from the inner lobby would not be shown because petitioner had positioned himself in the cameras' "blind spot", rather than because videos had been lost.  Petitioner's counsel made no objection.  However, following the prosecutor's opening statement, petitioner's counsel offered the following in his opening statement:

> There were four security cameras in all.  The testimony in this case is going to be that the police received the video footage from two of these four cameras, and that's the video footage you're going to see.  They did not recover, the evidence will show, or retrieve the video footage from the room in which the alleged robbery took place.  There's no reasonable explanation for why that happened. That is what the evidence will show.  Trial Tr. p. 18 (Dkt. No. 11).

Later in the trial—when the jury was not present—the prosecutor represented to the court that one of the officers who had viewed the now-overwritten videos would be willing to testify that those videos showed a person resembling petitioner with a hand outstretched in a manner consistent with the display of a police shield.  Trial Tr. p. 132 (Dkt. No. 11).  The prosecutor further stated that when police detectives visited the building several days later to copy and retrieve video evidence, they were unaware that the cameras from the inner lobby had captured such an image.  *Id.*

3

The prosecutor made this disclosure out of "an abundance of caution", in case petitioner's counsel might want to elicit testimony to this effect from the officer who had viewed the overwritten videos.  Petitioner's counsel did not seek to elicit that testimony.  Instead, petitioner's counsel requested that the court prohibit officers who viewed the lost videos from testifying that those videos contained no pertinent information.  The court ruled that the officers should offer no testimony as to the content of the lost videos.

In his closing, petitioner's counsel further contested prosecutor's assertion that the videos from the inner lobby were not retrieved because petitioner committed his crimes in the blind spot of the cameras:

> [T]he prosecution's position is, yes, there was a video system and, yes, it was working on the night of the incident, yes, we have copies of the video tape, but, no, we don't have copies of the room in which the robbery occurred . . . . I submit to you that the police didn't – that those tapes aren't here at trial because they did not show that a robbery occurred . . . . The prosecution . . . is going to try to cover over this issue by arguing that the robbery occurred in a blind spot of the security system.  Trial Tr. p. 286-89 (Dkt. No. 11).

Petitioner's counsel thus repeatedly communicated to the jury that the unavailability of the videos was a major weakness in the prosecutor's case, and a source of reasonable doubt.

A related issue in the case concerns whether petitioner's counsel failed to request that the judge instruct the jury to draw an adverse inference concerning the missing videos.  At the charge conference, petitioner's counsel requested no such instruction.  After the jury began deliberating, it asked to

4

see the two available surveillance videos.  Then, the jury sought guidance from

the judge as to how the missing surveillance videos could factor into a

reasonable doubt analysis.  Specifically, the foreperson asked: "What can we as

jurors take into determination when we have questions about the significance

[sic] of evidence submitted, for example [overwritten] cameras three and four?"

Trial Tr. p. 327 (Dkt. No. 11).  The judge instructed the jurors not to speculate,

but that they were permitted to "draw whatever reasonable inference you can

from the evidence or lack of evidence submitted."  Trial Tr. p. 332 (Dkt. No. 11).

On June 1, 2009, the jury found petitioner guilty on both counts.  On

October 27, 2009, petitioner moved to set aside the conviction, arguing that the

state offered impermissible photo array evidence against him and that counsel

was ineffective for not calling petitioner's wife as a witness to contradict parts

of the state' case and impeach the victim's testimony.  On January 15, 2010,

petitioner's motion was denied.

On February 2, 2010, court sentenced petitioner, as a persistent violent

felony offender, to a total prison term of 20 years to life.

Petitioner appealed the conviction to the Appellate Division, First

Department, on three grounds.  First, petitioner argued that the trial court

abused its discretion in a pre-trial *Sandoval* ruling that permitted the

prosecutor to cross-examine petitioner, if petitioner took the stand, concerning

seven prior felony convictions.  Second, petitioner argued that his counsel was

ineffective for failing to seek a remedy for the prosecutor's statement, in

openings, that petitioner had positioned himself in the blind spot of the surveillance cameras in the building's inner lobby, and that that was why the state would not introduce those videos into evidence.  Third, petitioner argued that the sentence was excessive.  On March 29, 2012, the Appellate Division rejected petitioner's arguments and affirmed the conviction.  *People v. Gonzalez*, 93 A.D.3d 610 (1st Dept.).

The New York Court of Appeals subsequently denied leave to appeal. *People v. Gonzalez*, 19 N.Y.3d 996 (2012).

### The Present Petition

Petitioner now applies, *pro se*, for a writ of habeas corpus, arguing on four grounds.  The first ground is that the prosecutor engaged in misconduct. Petitioner contends that the prosecutor made a misrepresentation by telling jurors, in the opening statement, that they would not be shown surveillance videos from cameras in the apartment building's inner lobby because petitioner deliberately positioned himself in the cameras' blind spot during the robbery. The second ground is that petitioner received ineffective assistance of counsel. Petitioner contends that his trial counsel (a) failed to object to the prosecutor's false statement in the opening, (b) neglected to timely request an adverse inference jury instruction concerning the missing surveillance videos from the apartment building's inner lobby, and (c) failed to call as a witness petitioner's wife, who could have testified that petitioner and the victim knew one another before the crime, thus suggesting that victim could not have believed petitioner

6

was a police officer.  The third ground is that the trial court abused its

discretion in a pre-trial *Sandoval* ruling that permitted the prosecutor to cross-

examine petitioner, if he testified, concerning seven prior felony convictions.

Petitioner contends that the *Sandoval* ruling effectively denied him his right to

testify on his own behalf.  The fourth ground is that the sentence of 20 years to

life imprisonment is excessive.

### Discussion

A federal court may grant habeas corpus relief only where a claim that

was adjudicated on its merits in state court resulted in a decision contrary to

clearly established federal law, or resulted in a decision based an unreasonable

determination of facts by the state court.  *See* 28 U.S.C. § 2254(d).  This

represents a "formidable barrier to federal habeas relief for prisoners whose

claims have been adjudicated in state court." *Burt v. Titlow*, 134 S.Ct. 10, 16

(2013).

Furthermore, before a federal court may grant habeas relief to a state

prisoner, "the prisoner must exhaust his remedies in state court." *O'Sullivan v.

Boerckel*, 526 U.S. 838, 842 (1999).  Thus, a petitioner must have presented

each claim to all levels of the state courts before federal relief on a particular

claim may be granted.  *See, e.g., Baldwin v. Reese*, 541 U.S. 27, 29 (2004).

<u>Petitioner's Ineffective Assistance of Counsel Claims</u>

Petitioner argues that his counsel failed in three ways.  First, petitioner's

counsel failed to object to the prosecutor's comment in openings that petitioner

7

committed the robbery in the surveillance cameras' "blind spot."  Second, petitioner's counsel failed to make a timely request for an adverse inference instruction concerning the state's failure to preserve the surveillance videos from the inner lobby where the robbery occurred.  Third, petitioner's counsel failed to present at trial the testimony of petitioner's wife, Lisa Parzini. Petitioner argues that Ms. Parzini would have testified that the victim had been a guest at petitioner's home on multiple occasions, thus undermining the victim's credibility and showing that the victim could not have believed petitioner was a police officer.  Representation is constitutionally deficient only where a lawyer's work falls below an objective reasonableness standard, and where there is a reasonable probability that but for the errors, the proceeding would have turned out differently.  *See Strickland v. Washington*, 466 U.S. 668, 688 (1984).

### A. *"Blind Spot" Remark in Openings*

Petitioner should have objected to prosecutor's "blind spot" remark in openings.  However, evaluating the evidence as a whole, there is no probability that such an objection in openings would have changed the outcome of the proceedings.

Indeed, in closing arguments, petitioner's counsel forcefully argued to the jury that the state's failure to produce the video evidence from the inner lobby was a source of reasonable doubt.  He submitted that the evidence showed the "blind spot" theory to be false.  The jury therefore considered the possibility

8

that the detectives failed to retrieve the videos from the inner lobby due to incompetence or dishonesty, rather than due to a belief that the videos did not contain relevant information.

Furthermore, during deliberations, the jury asked the judge for guidance on what they might properly infer from the absence of video evidence. This suggests that the jurors were sensitive to the possibility that the missing video evidence might be exculpatory, and moreover, were not unduly reliant on the prosecutor's assertion that the videos were not produced because petitioner had positioned himself in the cameras' blind spot.

Additionally, the jury heard a great deal of evidence that independently supported petitioner's conviction. For example, the victim offered detailed and extensive testimony implicating petitioner in the robbery. The existing video evidence corroborated parts of victim's testimony, and the jury likely found him credible. Additionally, petitioner possessed a false police shield at the time of his arrest—a highly significant point of circumstantial evidence. This court therefore cannot say that an objection to the prosecutor's "blind spot" remark in openings would have had any probability of changing the outcome of the proceedings.

### B. *Failure to Timely Request Adverse Inference Jury Instruction*

Likewise, this court cannot find a reasonable probability that the outcome of the proceedings would have been different had petitioner's counsel requested an adverse inference instruction at the charge conference. Indeed,

petitioner cannot show that he would have received such an instruction, had his counsel requested one.

To be sure, if law enforcement had destroyed the videos, an adverse inference would have been proper.  *See People v. James*, 93 N.Y.2d 620, 644 (1999).  But the record here shows no such thing.  Rather, law enforcement merely did not retrieve and copy certain videos from the crime scene.  Those videos were subsequently overwritten, in the normal course of business, by the third party in charge of the apartment building's security.  Furthermore, while the reasons that law enforcement neglected to copy the missing videos are not entirely clear, it is far from obvious that the videos would have exculpated petitioner or that law enforcement meant to suppress evidence.  Finally, in any case, the instruction that the jurors ultimately received permitted them to draw reasonable inferences in petitioner's favor on the basis of the missing video evidence.  *See* Trial Tr. p. 332 (Dkt. No. 11).

### C. *Failure to Call Petitioner's Wife as a Witness*

Petitioner's third argument for ineffective assistance of counsel—that his counsel should have called petitioner's wife, Lisa Parzini, to the witness stand—is unexhausted.  Petitioner could still raise this claim in a motion to vacate his conviction under CPL § 440.10.

The court notes, however, that the merits of the claim are questionable.  Petitioner's counsel may have had strategic reasons for not calling Ms. Parzini to testify.  For example, she may not have been a credible witness because she

was petitioner's wife.  Nonetheless, this court declines to rule on the unexhausted claim, as it falls short of being "plainly meritless."  *See Rhines v. Weber*, 544 U.S. 269, 277 (2005).  Without requiring a formal amendment, the court considers it deleted.  The rest of the instant petition may proceed unhindered, leaving petitioner free to exhaust this particular claim in a separate state court proceeding.  *See id.* at 278.

## Petitioner's Prosecutorial Misconduct Claim is Procedurally Defaulted

Petitioner argues that the prosecutor knowingly made a false statement in openings by contending that petitioner committed the crime in the surveillance cameras' blind spot.  However, the claim is procedurally defaulted because it is based on matters in the record, yet was never brought in state court.  N.Y.McKinney's Penal Law CPL § 440.10(2)(c).  This court must decline to hear a procedurally defaulted claim unless there was cause for the default, or unless declining to hear the claim would result in a miscarriage of justice. *Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001).  In this case there was no cause for the default.  The factual basis of the prosecutorial misconduct claim (the prosecutor's alleged false statement) was raised in state court as part of petitioner's ineffective assistance of counsel claim, so nothing prevented petitioner from also asserting the prosecutorial misconduct claim at that time. *See Murray v. Carrier*, 477 U.S. 478, 492 (1986).  Moreover, the court cannot hear the claim on the ground of preventing miscarriage of justice, because

11

there is insufficient evidence for the court to conclude that petitioner is actually innocent.

Accordingly, the court does not grant relief on the basis of prosecutorial misconduct.

### The Court Cannot Grant Relief on Petitioner's Sandoval Claim Because Petitioner Did Not Testify at Trial

Petitioner's third ground for habeas corpus relief is that the trial court ruled for the government on a pre-trial *Sandoval* ruling, determining that eight of petitioner's prior convictions, including seven felonies, were proper topics of limited cross-examination.  *See People v. Sandoval*, 34 N.Y.2d 371 (1974). Petitioner argues that this ruling, in effect, deprived him of his right to testify on his own behalf, because taking the stand would have resulted in an extremely damaging cross-examination concerning these past convictions.

The Supreme Court has held that a defendant must testify in order to raise and preserve for review a claim of improper impeachment by prior conviction.  *Luce v. United States*, 469, U.S. 38, 43 (1984).  Courts in this district, moreover, have found that a defendant who did not testify may not subsequently argue that he lost his right to do so because impeachment would have resulted had he taken the stand.  *See, e.g., John v. New York*, 12 Civ. 1944, 2013 WL 6487384 at *11 (S.D.N.Y. Nov. 25, 2013).  Here, petitioner did not testify at trial.  It is therefore impossible to know whether his decision not

to testify was motivated by fear of impeachment, or whether other reasons also played a role.  *See id.*

The court does not grant relief on the basis of petitioner's *Sandoval* claim.

## *The Court Cannot Grant Relief on Petitioner's Excessive Sentence Claim*

Petitioner's fourth ground for relief is that his sentence of 20 years to life imprisonment is harsh, excessive, and disproportionate to the crime.

The claim is procedurally defaulted.  Petitioner did not include it in his application for leave to appeal at the New York Court of Appeals.  *See* Application for Leave to Appeal (Dkt. No. 1-3).  Further, it may not be raised in a motion to vacate the judgment because it is based on matters of record.  *See Ramirez v. Attorney General*, 280 F.3d 87, 94 (2d Cir. 2001).  Since circumstances justifying review of procedurally defaulted claim are absent here, the court cannot grant relief.  *See Aparicio*, 269 F.3d at 90.

The court notes, moreover, that even if it could grant relief on this claim, petitioner was sentenced as a persistent felony offender.  His sentence appears to be within the limits of Penal Law § 70.08.  And courts in this Circuit have consistently upheld the constitutionality of New York's persistent felony offender sentencing scheme.  *See, e.g., Portalin v. Graham*, 624 F.3d 69, 93-94 (2d Cir. 2010).

## Conclusion

Petitioner's ineffective assistance of counsel claim concerning the failure to call Lisa Parzini as a witness is dismissed without prejudice, because petitioner has not yet exhausted it in New York courts.  The rest of petitioner's claims are denied.

SO ORDERED.

Dated:  New York, New York
      December 5, 2014

Thomas P. Griesa
United States District Judge

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12/5/14